### WILLIAM H. HINE *vs.* MERRITT WOODING.

The statutes with regard to fences have left the common law, in regard to the duty of the owners of cattle to restrain them, still in force as to unruly cattle that will not be restrained by ordinary fences. Land owners are not bound to fence against such cattle.

"Ordinary fences," in the statute (Gen. Statutes, tit. 21, sec. 12,) which speaks of "unruly cattle that will not be restrained by ordinary fences," does not mean lawful fences, but such fences as are common, and sufficient to restrain orderly cattle.

A review of the legislation on the subject from the settlement of the state.

A part of the divisional fence between the plaintiff and defendant which it was the duty of the plaintiff to maintain, was insufficient. The defendant's horse was found in the plaintiff's enclosure, having jumped in from the defendant's, over some part of the plaintiff's fence. Held that evidence that he jumped back over a part of the fence that was of lawful height, was admissible to show that, at the time he entered, he was unruly and not to be restrained by an ordinary fence.

TRESPASS *qu. cl. fr.*, appealed from a justice of the peace, and tried to the jury, in the Court of Common Pleas in New Haven county, on the general issue with notice, before *Bronson, J.*

The trespass was committed by three horses of the defendant in a close of the plaintiff, into which they escaped from a contiguous close of the defendant. It was proved that the horses got in over a part of the division fence which it was

the duty of the plaintiff to maintain; and the defendant claimed that this part of the fence was less in height than a lawful fence of four and a half feet.

The plaintiff offered evidence to prove that when he found the horses in his close he drove out two of them and put up the fence; that the other horse followed after and jumped over the divisional fence into the defendant's close; and that the fence, where the horse jumped over, was four feet six and one half inches high, and that the horse in making the leap jumped at least eighteen inches above the fence. To this evidence the defendant objected, on the ground that proof that the horse was unruly at that time was inadmissible, as the trespass had already been committed; but the court admitted it.

The plaintiff further offered evidence to prove that the horses of the defendant were accustomed to jump over common rail fences, less in height than lawful fences. To this evidence the defendant objected, and claimed that the term "ordinary fences" as used in the statute (Gen. Statutes, page 446, sec. 12,) means the different kinds of lawful fences; but the court did not so rule, but permitted the plaintiff to prove that the horses were accustomed to get over ordinary fences, which he ruled might be less in height than lawful fences, and that the word "ordinary," as used in the statute referred to, does not mean the different kinds of lawful fences, but is to be taken in its usual sense.

The defendant requested the judge to charge the jury,—1. That the law was so that in order to prove that the horses were unruly at the time of the alleged trespass, it must be proved that they were accustomed, of their own free will, to jump over ordinary lawful fences. 2. That the burden of proof was on the plaintiff to show that at the time they committed this trespass they were unruly, and that the word "unruly," as used in the statute, as applicable to cattle, means those that will not be restrained by ordinary lawful fences. 3. That the word "ordinary," in qualification of the word "fences" in the statute, means the different kinds of lawful fences.

The court refused to charge the jury as requested, except that the burden of proof was upon the plaintiff to prove the horses unruly.

The jury rendered a verdict for the plaintiff; and the defendant moved for a new trial, for error in the rulings and charge of the court.

*Hine*, in support of the motion, cited, with regard to the meaning of the term " ordinary fences," Gen. Statutes, tit. 21, secs. 1, 11, 12; 1 Swift Dig., 12; *Studwell* v. *Ritch*, 14 Conn., 292, 295; *Barnum* v. *Vandusen*, 16 id., 200, 206; *Wright* v. *Wright*, 21 id., 329, 344.

*Munger*, contra.

Butler, C. J. The evidence offered to prove that one of the horses in leaving the plaintiff's close did not jump over the deficient part of the fence, but over the lawful fence, and eighteen inches above it, was properly admitted. It certainly tended to show that the animal was accustomed to jump fences, and was unruly. The objection that it was after the trespass had been committed was not well taken. No time had elapsed, from the time he jumped in, before he jumped out, during which he could have learned to be unruly, nor had he any opportunity to acquire the vice.

The only other question raised upon the motion is, whether the judge properly ruled and charged that the word "ordinary," in qualification of the word "fences" in section 12, p. 446, of the Revised Statutes of 1866, means the different kinds of lawful fences. This question involves a construction of that section of the statute. We are of opinion that the ruling and charge of the judge were correct.

The first section of the statute in relation to fences requires that the proprietors of land shall make and maintain sufficient fence or fences to secure their particular fields and enclosures, and prescribes what shall be deemed a sufficient and lawful fence. It is claimed that this section covers the whole ground, and regarded alone it would seem to require

of every man to secure his land by a lawful fence or abide the consequences; and such would undoubtedly be the effect if there were no qualification of it. But the twelfth section of the same chapter provides that " no person shall be entitled to a recovery for damages done in his inclosure, through the insufficiency of his fence, unless such damages were done by swine or horses or other creatures that go at large on the commons contrary to law; or by unruly cattle that will not be restrained by ordinary fences; or unless the owner of cattle shall put his cattle into or voluntarily trespass on his neighbor's inclosure; or unless it shall appear that though part of the fence is deficient, the cattle broke and entered through a sufficient fence; in which cases the owner of the land may impound such creatures and recover poundage and damages."

The claim of the defendant was, that the term " ordinary fences," as used in connection with unruly cattle, meant lawful fences. This construction cannot be adopted for several reasons.

In the first place, such a construction would be inconsistent with the obvious purpose of the section. That purpose was to state certain exceptional circumstances under which the owner of land may recover damages for injury done in his inclosure, although his fence is insufficient. It makes four exceptions to the general rule, that there can be no recovery for damages for trespass by cattle where the fence is insufficient, and damage done by unruly cattle is one of them. There would be no reason for exempting unruly cattle if they were not to be deemed unruly unless they jumped lawful fences; for if they broke in over or through a lawful fence, the owner of them would be liable for damages whether they were unruly or not. "Ordinary" in such a connection means *common* or *usual*, and it is obvious that the meaning of the word as there used is different from that of the word " *lawful*" as used in other parts of the statute. And inasmuch as it is notorious that fences which are lawful when made are constantly, by settling and otherwise, becoming unlawful, and a large proportion of the fences of the state are not of lawful

height, and are yet sufficient to restrain ruly cattle, and there is therefore a class of common fences to which the term ordinary in contradistinction from lawful can properly apply, we should feel no hesitation in so applying it, if there were nothing else to guide us in the construction. But there are other matters for our guidance, which are clear and conclusive.

It is perfectly apparent from the history of our legislation in relation to fences that it has never been the policy of our law to require any man to fence against unruly cattle. During the first few years after the settlement of the colony there was no law requiring individuals to fence their allotted lands. Tracts for cultivation were fenced off as common fields, and divided up among the settlers, who were each required to make a proportionate part of the common fence. To compel the performance of that duty, a committee was appointed in 1643 to view the fences and compel their erection and maintenance by the imposition of fines. In 1650 the duty was imposed on the townsmen or selectmen, and in 1662 on fence-viewers. Individual proprietors were at liberty to fence their allotments, either in or out of the common field, but there was no law at that time requiring them to fence their particular lands. As the proprietors came to fence their particular allotments, laws were made regulating such fencing at mutual expense where particular enclosures adjoined. To the laws relating to that subject Mr. Ludlow, in the code prepared by him in 1650, added the following proviso: "Provided also, that no man shall be liable to satisfy for damage done in any ground not sufficiently fenced, except it shall be for damage done by swine under a year old, or unruly cattle which will not be restrained by ordinary fences, or where any man shall put his cattle or otherwise voluntarily trespass upon his neighbor's ground. And if the party damnified find the cattle damage-feasant, he may impound or otherwise dispose of them."

This provision was added to, and became a distinct section in, a subsequent revision, and that portion of it which relates to unruly cattle has passed, unaltered in any word or partic-

ular, through every revision of the statutes from that time to this, a period of 220 years. The common law of England then required and still requires every man to take care of his own cattle, and there was at that time no law of the colony which required any man to protect his land by a fence.

In 1666 it was ordered " that all the inhabitants of this jurisdiction shall make and maintain sufficient fence or fences to secure their improvable lands against cattle of all sorts whatsoever, unruly cattle alone excepted. And what damage is done by cattle through the want or insufficiency of fence, (except as before excepted,) it shall not be recoverable by law."

This provision also has passed through every revision from that time to this. It has been modified by leaving out the exception because contained in another section, but the principal provision has not been changed. It is the basis of the first part of the first section of our present statute in relation to fences.

What should be deemed a sufficient fence was left originally to the committee of seven, afterwards to the townsmen or selectmen, and afterwards to the fence-viewers. There was no provision of law at that time prescribing what should be a lawful fence. In 1702 a law was passed which prescribed that " all five rail fence and stone wall four feet high, well and substantially erected, and all other fence, either rail, board, hedge, ditch, brook, rivers, creeks, etc., which in the judgment of fence-viewers shall be equivalent to said five rail fence, shall be adjudged sufficient fence." To this in 1732 was added the following : "And that such quick set fence as shall be accounted sufficient in the judgment of the fence-viewers to fence against ruly horses, neat cattle and sheep, shall be adjudged and accounted sufficient fence."

These three provisions, constituting distinct sections of the statute relating to fences, were continued, with some modifications, but without material alteration, down to the time of the revision of 1821. At that time the revisors, pursuant to their plan of condensing and simplifying the statutes, embodied two of the provisions—that requiring all lands to

be fenced with a sufficient fence, and that prescribing what should constitute a lawful fence—in one section, making the first section of our present act. The other provision relating to the impounding of unruly cattle, &c., which now constitutes the 12th section of our present act, and the one we are considering, they transferred to the chapter relating to pounds. In 1866 the revisors restored it to its proper place in the act relating to fences.

It is apparent from this brief history of the three original provisions which now constitute the two sections we have under consideration, that the common law doctrine, that every man is bound to take care of his cattle, has never been abrogated in relation to unruly cattle in this state. This was substantially determined by this court in the case of *Barnum* v. *Vandusen,* 16 Conn., 200. In that case the sheep of the defendant entered the plaintiff's land through his insufficient fence, and in order to subject the defendant the plaintiff offered to prove that the sheep were unruly, and would not be restrained by an ordinary fence. The court admitted the testimony, and the Supreme Court affirmed the judgment. Judge Hinman, in giving the opinion, said : " Taking and construing these two statutes together, as we think they ought to be construed, upon the principle regarding statutes relating to the same subject and having one object in view, we think it manifest that the legislature did not intend that the owners of land should be compelled to fence against unruly animals, of any kind."

The statutes of the state have not at any period given or contained any other test of unruliness except that contained in the section we are considering. There was a statute passed in 1687, providing that the owner of unruly cattle should pay double damages if they trespassed, and were adjudged to be unruly by the selectmen, but that statute was soon after repealed.

We have then, to guide us in the construction in question, the following facts derived from a history of our legislation on the subject, viz : First, the clause was adopted into and became a part of the statutes of the state fifty-two years

before there was any provision prescribing what should be a lawful fence and when "ordinary fence" meant common fence, *sufficient to restrain ruly cattle.* Second, it has been continued without any change of phraseology from its first appearance in the code of Mr. Ludlow in 1650 until the present time, and it must be presumed with intent to convey the same meaning. Third, the principle which underlies the provision and has sustained it as one of the unlawful trespasses for which a man can recover, notwithstanding his fence is insufficient, is, that the common law in relation to unruly cattle has never been changed by statute; that no man is bound to fence against them; and that every man who keeps them, keeps them at his peril. And fifth, that the term "ordinary" has been thus carefully continued in the same statute and the same connection from its first introduction in 1650 for the purpose of furnishing a *legal test of unruliness.* The exception against unruly cattle made a legal test necessary and no other has ever been prescribed or used, in the statutes or out of them, from that day to this; nor has any other been practicable from the nature of the case and the general character of the fences of the state.

A new trial is not advised.

In this opinion the other judges concurred.